**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LILLIE MAE ROGERS** | * | |
| | * | |
| **Plaintiff,** | * | **Civil Action No. 12-00348-B** |
| | * | |
| **vs.** | * | |
| | * | |
| **CAROLYN W. COLVIN,**[1] | * | |
| **Commissioner of Social Security,** | * | |
| | * | |
| **Defendant.** | * | |

## ORDER

Plaintiff Lillie Mae Rogers (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.*  On April 19, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 21).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

Plaintiff protectively filed an application for a period of disability, disability insurance benefits, and supplemental security income on October 22, 2008. (Doc. 15, att. 1; Tr. 308).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff alleges that she has been disabled since April 24, 2007, due to hyperthyroidism, osteoarthritis of the knees, migraines, and adjustment disorder with anxiety and depressed mood. (Tr. 86; Doc. 15, att. 1).  Plaintiff's applications were denied and upon timely request, she was granted an administrative hearing before Administrative Law Judge Alan E. Michel (hereinafter "ALJ") on July 8, 2010. (Id. at 315).  At the hearing, Plaintiff requested a continuance, and the hearing was recessed until September 16, 2010. (Id. at 315, 320).  Plaintiff attended the second hearing with her counsel and provided testimony related to her claims. (Id. at 320).  On October 25, 2010, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 12).  The Appeals Council denied plaintiff's request for review on March 28, 2012. (Id. at 4).  The parties waived oral argument (Docs. 19, 20), and agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   Issues on Appeal

      **A.**   **Whether the ALJ erred in finding that Plaintiff's impairments of adjustment disorder with anxiety and depression and migraines were not severe?**

      **B.**   **Whether substantial evidence supports the ALJ's RFC assessment?**

## III.   Factual Background

Plaintiff was born on October 21, 1961, and was 48 years of age at the time of her administrative hearing on September 16, 2010. (Tr. 328).  Plaintiff testified at the hearing that she graduated from high school and last worked in 2007 as a cook for an assisted living facility. (Id. at 328, 332-33).  According to Plaintiff, she can longer work because she has "weakness, dizziness, blurred vision and [is] in pain quite a bit." (Id. at 86).  Plaintiff testified that on a regular day, her pain is an eight out of ten on the pain scale, and that she can stand for about thirty minutes at a time and sit for about forty-five minutes at a time. (Id. at 337).  According to

Plaintiff, if she stands longer than forty-five minutes, her legs, knees, and lower back start to hurt. (Id.). Plaintiff also testified that she experiences about five migraines per month, which leave her feeling "washed out" for the entire day. (Id. at 338). Plaintiff testified that her medications include Prozac for depression, Propranolol for migraines, Cyclobenzaprine as needed for muscle spasms, Ibuprofen, and Tylenol.[2] (Id. at 134).

## IV.   Analysis

### A.   Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[3] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking

---

[2] Prozac is in a class of medications called selective serotonin reuptake inhibitors and is used to treat depression. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html. Propranolol is in a class of medications called beta blockers and is used to treat high blood pressure and migraine headaches. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html. Cyclobenzaprine is a muscle relaxant that is also used relieve pain. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

[3] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

### B.   Discussion

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).   The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[4] 20 C.F.R. §§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity throughout the period under consideration and that she has the severe

---

[4] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

impairments of hyperthyroidism, hypothyroidism, status post thyroidectomy, hypertension, and osteoarthritis of the bilateral knees.[5] (Tr. 14).  The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 17).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform the full range of sedentary work. (Id.).  The ALJ also determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not credible to the extent that they were inconsistent with the RFC. (Id. at 20).

While the ALJ determined that Plaintiff's RFC precludes her from performing her past work as a cook; he also concluded that given Plaintiff's residual functional capacity for the full range of sedentary work, as well as her age, education, and work experience, a finding of "not disabled" was directed by the Medical-Vocational Guidelines (the "grids"),[6] specifically Rule 201.21. (Id. at 21).  Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

---

[5] The ALJ also considered Plaintiff's depression, anxiety, and migraines but did not find them to be severe impairments. (Tr. 15-16).

[6] In order to determine whether a claimant has the ability to adjust to other work in the national economy, the ALJ may apply the "grids" or use a vocational expert. Lapica v. Commissioner of Soc. Sec., 501 Fed. App'x 895, 897 (11th Cir. 2012) (unpublished).  The ALJ may rely exclusively on the grids where the claimant is able to perform a full range of work at a given residual functional level and has no non-exertional impairments that significantly limit his or her basic work skills.  See Allen v. Sullivan, 880 F.2d 1200, 1201-02 (11th Cir. 1989).  In this case, there is no substantial evidence that Plaintiff's non-exertional limitations significantly limit her basic work skills.  Therefore, the ALJ properly relied on the grids in lieu of the testimony of a vocational expert regarding whether Plaintiff has the ability to adjust to other work in the national economy. (Tr. 21).

1. __Medical Evidence__[7]

The medical records reflect that Dr. Sandeep Bhadkamkar at Tri County Medical Center has treated Plaintiff since about January 2005. (Id. at 154).  During 2007, Plaintiff saw Dr. Bhadkamkar four times for a variety of ailments including cough, earache, sore throat, allergic rhinitis, shortness of breath, dizziness, itching, and heart murmur. (Id. at 137-40).  On April 2, 2007, Dr. Bhadkamkar diagnosed Plaintiff with a cough, goiter, hyperthyroidism, cardiac murmur, allergic rhinitis, and history of dizziness. (Id. at 139-40).  Dr. Bhadkamkar prescribed Flovent, Nasonex, and Depo-Medrol, and ordered a 2D echo of the chest, a sonogram of the neck, and lab work. (Id.).  In addition, he advised Plaintiff to see a pulmonologist in view of her recurrent cough and an endocrinologist for her hyperthyroidism.[8] (Id.).

The records reflect that on April 9, 2007, Plaintiff saw an endocrinologist, Dr. Judson Menefee, who diagnosed her with Graves' hyperthyroidism. (Id. at 136).  Dr. Menefee noted that Plaintiff had a moderate size goiter and a fine tremor of the outstretched hands. (Id.).  He prescribed Tapazole and ordered follow up laboratory studies. (Id.).  Plaintiff returned to Dr. Bhadkamkar on May 7, 2007, and he noted that Plaintiff had seen an endocrinologist who prescribed Tapazole, as well as a pulmonologist who concluded that her shortness of breath was caused in part by her excessive weight and a mild ventral defect. (Id. at 138).  Upon examination, Dr. Bhadkamkar noted an enlarged thyroid, a systolic murmur, and a "slight lumpy feeling in the left upper quadrant of the abdomen." (Id.).  He prescribed Tapazole and Inderal (Propranolol)

---

[7] While the undersigned has considered all the evidence of record, only those records bearing on Plaintiff's condition during the relevant time period are highlighted.

[8] In April 2007, Dr. Bhadkamkar noted that an x-ray taken of Plaintiff's chest was normal. (Tr. 139).

and recommended an MRI of the brain and a sonogram of the abdomen. (Id.)

In 2008, Plaintiff received medical treatment sixteen times for various ailments. (Id. at 190-203, 245-66, 270-86, 305).   In January and February 2008, Plaintiff was treated at the outpatient clinic at Atmore Community Hospital for complaints of cough, body aches, chills, sore throat, runny nose, nasal congestion, headaches, and depression. (Id. at 260-62).   She was instructed to take Nasocort and Claritin for congestion and was prescribed Effexor for depression. (Id. at 260-61).   Plaintiff was also prescribed Methimazole for her hyperthyroidism and referred to a surgeon, Dr. Robert Patacsil, for removal of her thyroid. (Id. at 260).   In February, March, and April 2008, Plaintiff returned to the outpatient clinic and reported abdominal and pelvic pain, fever, chills, body aches, sore throat, cough, and headache, which she described as an eight out of ten on the pain scale. (Id. at 255, 257-59).   She was prescribed Toradol for pain and scheduled for an EKG, a stress test, and a Pelvic CT scan.[9] (Id. at 256-57). Plaintiff reported that the Effexor, which had been previously prescribed for depression, was working well. (Id. at 255).   A CT scan of Plaintiff's brain taken on March 24, 2008, showed "no inf[ar]ct, intracranial bleed, or masse effect," and "[n]o change since 07-02-07."[10] (Id. at 282). In May 2008, Plaintiff returned to the clinic complaining of dizziness, nausea, weakness, and headache pain, which she described as a seven out of ten on the pain scale. (Id. at 253).   Plaintiff reported that Excedrin provided minimal relief. (Id.).   Plaintiff was prescribed Methimazole for hyperthyroidism and Propranolol for migraine headaches. (Id.).

---

[9] A pelvic ultrasound taken on February 26, 2008, revealed "[a] couple of small fibroids." (Tr. 284).   A pelvic ultrasound conducted on March 6, 2008, revealed a three cm solid appearing structure adjacent to the left ovary, etiology unknown. (Id. at 283).   A pelvic ultrasound conducted on April 4, 2008, revealed that the uterus was "unremarkable" with "no mass or lesion seen." (Id. at 281).

[10] The Court has been unable to locate the report from the 2007 CT scan of Plaintiff's brain.

On July 8, 2008, Plaintiff was admitted to Atmore Community Hospital and diagnosed with chest pain, tachycardia, fever, history of hypothyroidism, and medication non-adherence. (Id. at 190).  A chest x-ray was normal, and the consulting cardiologist, Dr. Kenneth Burnham, opined that Plaintiff's chest pain was likely non-cardiac and suggested a CT scan if she failed to improve. [11] (Id.).  Plaintiff was discharged in stable condition on July 11, 2008, with Methimazole, Propranolol, and Tylenol.  She was instructed to follow up with Dr. Patacsil. (Id. at 190-91).

On July 29, 2008, Plaintiff returned to the clinic and reported neck pain and stiffness, runny nose, chills, fever, and headaches, which she described as an eight out of ten on the pain scale. (Id. at 252).  She was diagnosed with bronchitis, neck pain, and uterine prolapse and prescribed Norel SR and Pro Air for bronchitis and Ultram for neck pain. (Id.).  The physician's assistant referred Plaintiff to a specialist for uterine prolapse. (Id.).  In August 2008, Plaintiff presented to the outpatient clinic for treatment of strep throat. (Id. at 251).  Plaintiff described her pain as a nine out of ten on the pain scale. (Id.).

On September 2, 2008, Dr. Patacsil admitted Plaintiff to the hospital and performed a total thyroidectomy.  His records indicate that Plaintiff tolerated the procedure well and that the pathology report was negative for malignancy. (Id. at 249-50, 277).  At Plaintiff's follow up appointment on September 10, 2008, Plaintiff stated that she felt "fair" but was having pain, anxiety, and difficulty falling asleep. (Id. at 248).  She was prescribed Propranolol, Methimazole, and Ativan. (Id.).

---

[11] An echocardiogram conducted on July 9, 2008 showed that Plaintiff had a "[m]ild concentric left ventricular hypertrophy with normal systolic function and ejection fraction of 60%" with "evidence of minimal to mild aortic stenosis with trivial aortic insufficiency." (Tr. 195).  Dr. Burnham noted that "[c]ompared to previous echocardiogram dated 04-04-07, no significant interval changes have occurred." (Id.).

On October 20 and 21, 2008, Plaintiff presented to the outpatient clinic with complaints of neck pain at the thyroidectomy scar, chest pain, headache, and a "hot flash." (Id. at 246-47). Plaintiff denied "current pain" at the appointments. (Id.).  She was prescribed Methimazole and a stress test was ordered. (Id. at 146).  A few of days later, on October 23, 2008, Plaintiff sought treatment for chest pain [12] and headache presented to the Atmore Community Hospital Emergency Room.  She described her pain as an eight out of ten on the pain scale, and reported that she was out of her pain medication. (Id. at 197, 199, 201).  The treating physician, Dr. Steven Sharp, gave Plaintiff Demerol and Phenergan, which reduced her headache to a five out of ten on the pain scale. (Id. at 199-200).  Dr. Sharp discharged Plaintiff in stable condition with instructions to take Naprosyn and Fioricet and to follow up with her primary care physician if her symptoms did not improve. (Id. at 202, 204).

On November 3, 2008, Dr. Jonah McIntyre ordered a chemical stress test because of Plaintiff's complaints of chest pain.  The results of the test were "equivocal." (Id. at 263-66).  In addition, the results of an ECG conducted after Plaintiff's stress test were "unremarkable." (Id. at 264).  The following day, on November 4, 2008, Plaintiff returned to the outpatient clinic and reported high blood pressure and headache during her stress test the previous day. (Id. at 245). She was prescribed Lexapro for depression and anxiety. (Id.).

On February 21, 2009, the Agency referred Plaintiff to Dr. John Nelson for a consultative physical examination. (Id. at 209)   Plaintiff reported to Dr. Nelson that she had experienced hyperthyroidism for four years, bilateral knee pain for the previous six weeks, which she rated as

---

[12] An x-ray taken on October 23, 2 008, showed "mild heart prominence with no active or acute process or interval change." (Tr. 205).

a "10/10,"[13] blood pressure problems for two to three years, a prolapsed uterus, and depression. (Id.).   She also reported that she had been out of her medications for two months. (Id.).   Dr. Nelson noted that Plaintiff was "independent with her activities of daily living" and that she "[c]an drive and can lift light objects." (Id.).   Dr. Nelson's physical examination proved to be largely normal with respect to Plaintiff's head, ears, eyes, nose, throat, neck, lungs, heart, and abdomen. (Id. at 210).   Dr. Nelson noted that Plaintiff was in no acute distress, that she ambulated without assistance, and that she was able to rise from a sitting position without assistance. (Id.).   With respect to her extremities, Dr. Nelson noted that Plaintiff had bilateral swelling in her knees "with mild crepitus,"[14] "pain on movement," and a "slow careful gait" and that she could not stand on her tiptoes or heels, tandem walk, or bend and squat without pain. (Id.).   No edema, no cyanosis, or erythema was noted. (Id.).   In addition, Plaintiff's grip strength was "5/5," with adequate fine motor movements, dexterity, and ability to grasp objects bilaterally. (Id.).

With respect to Plaintiff's mental status, Dr. Nelson observed that Plaintiff was alert and oriented to time, place, and situation, that she was cooperative, that her memory was intact, that she had good insight and cognitive function, and that she was able to communicate with no deficits. (Id. at 211).   He also noted that Plaintiff appeared depressed. (Id.).   Plaintiff's neurological examination was largely normal. (Id.).   Dr. Nelson diagnosed Plaintiff with status post total thyroidectomy, hypertension, osteoarthritis (bilateral knees), chronic pain, depression, uterine prolapse (per claimant), obesity, and headaches. (Id.).   He concluded that, "[s]ubjectively,

---

[13] Plaintiff reported that the pain in her knees kept her up all night but that Ibuprofen "help[ed] with the pain somewhat." (Tr. 209).

[14] "Crepitus" refers to the cracking and popping of joints.   See http://www.hopkinsortho.org/joint_cracking.html.

the claimant complains of pain in both knees and depression.  Objectively, she has peri-articular swelling of both knees, pain on maneuvers, and limited range of motion of both knees." (Id.). Dr. Nelson further opined, "[f]rom a medical viewpoint, she needs to start back on her medications[;] this and weight loss should help with her osteoarthritis in the knees." (Id.).  Based on his physical examination, Dr. Nelson concluded that Plaintiff "most likely will have difficulty walking and/or standing for a full workday, or lifting/carrying objects without limitations. . . [but] [s]he should be able to sit for a full workday, hold a conversation, respond appropriately to questions, and carry out and remember instructions." (Id.).

In March 2009, Plaintiff returned to the outpatient clinic at Atmore Community Hospital and reported bilateral knee pain, muscle spasms in her neck, headache, and "just feel[ing] bad." (Id. at 244).  Plaintiff also reported that she had not had any medications in over a month. (Id.). The treating physician prescribed Mobic for knee pain and Propranolol for headache and again counseled Plaintiff regarding her weight. (Id.).

On March 9, 2009, State Agency physician Dr. Charles H. Crump reviewed Plaintiff's medical records and completed a Physical RFC Assessment.  His primary diagnosis was hypertension and his secondary diagnosis was osteoarthritis (bilateral knees), and other impairments of obesity and status post-thyroidectomy. (Id. at 213).  Dr. Crump opined that Plaintiff can occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk for at least two (but no more than four) hours in an eight-hour workday, sit for at least six hours in an eight hour workday, and occasionally push and/or pull. (Id. at 214-15).  Dr. Crump found that Plaintiff can never climb ladders or ropes but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Id. at 215).  He found no manipulative, visual, communicative, or environmental limitations, except that Plaintiff should avoid concentrated

exposure to hazards such as machinery and heights. (Id. at 216-17).

On March 10, 2009, the Agency referred Plaintiff to Dr. Thomas Bennett for a consultative psychological examination. (Id. at 221).   Plaintiff reported having hyperthyroidism for which she had corrective surgery in September 2008, hypertension, depression, and arthritis in her knees and legs. (Id.).   Plaintiff denied having had any mental health intervention or any psychiatric history in her family. (Id.).   Plaintiff reported daily activities including getting up at 9:30 a.m., preparing her own light breakfast, doing light household chores, going to the store, preparing her own lunch, talking to her children after their arrival from school, preparing the evening meal, and going to bed after midnight.   In addition, she does laundry, cooks, drives, shops, helps to care for her two children, watches television, sees friends fairly often, and goes to church. (Id. at 223).

Upon examination, Dr. Bennett noted that Plaintiff was neatly dressed and groomed, that her hygiene was good, that her posture was erect, that her gait and motor skills seemed normal, that her speech was normal, that she had a normal range of affect, and that she was alert and oriented in all spheres. (Id. at 222).   He also observed that Plaintiff's mood was mildly dysphoric, that her concentration and attention were unimpaired and that her thought processes normal. (Id. at 222-23).   In addition, her memory, fund of information, abstract reasoning skills, judgment and insight were average, except that she had little insight about what she could do to improve her physical health. (Id.).   Plaintiff showed no signs of hallucinations, delusions, ideas of unworthiness, helplessness, hopelessness or paranoid ideation, although she did show some signs of self-doubt and indecision. (Id. at 223).   Dr. Bennett opined that Plaintiff functions in the low average range intellectually, and noted that "[s]he is obviously preoccupied with her physical complaints;" she "appears to recognize that she might have some depression," but she

has not sought any intervention; and she "has no plans for future employment." (Id.).   Dr. Bennett diagnosed Plaintiff with Adjustment Disorder with Anxiety and Depressed Mood, and noted that Plaintiff is a woman who reports problems with depression but takes no antidepressant medications and seeks no mental health intervention. (Id. at 223-234).   In addition, she takes little care of herself physically.   Dr. Bennett opined that "it is highly likely that adequate self care would improve both her physical and her emotional functioning." (Id.).   He further noted that "the physical problems that [Plaintiff] reports are extremely common," and that her ability to relate to others, to function independently, to understand and carry out instructions, and to respond appropriately to supervisors and coworkers is average. (Id.).   He opined that Plaintiff "could probably make significant improvement in virtually every area of life with appropriate mental health intervention and with some health maintenance behaviors." (Id. at 224).

On March 19, 2009, State Agency psychologist Dr. Ellen Eno, Ph.D., reviewed Plaintiff's medical records and completed a Mental RFC Assessment wherein she opined that Plaintiff is "moderately" limited in four functional areas (ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to respond appropriately to changes in the work setting).   She found that Plaintiff is "not significantly limited" in the remaining sixteen functional areas. (Id. at 225-26).   According to Dr. Eno, Plaintiff "has the ability to understand and remember very short and simple instructions," she "can attend for two-hour intervals," and "[c]hanges in the work setting should be infrequent." (Id. at 227).   Dr. Eno also completed a Psychiatric Review Technique.   She diagnosed Plaintiff with "Adjustment Disorder with Anxiety and Depressed Mood" and opined that Plaintiff has "moderate" difficulties in maintaining concentration, persistence, or pace, "mild" difficulties in activities of daily living and

maintaining social functioning, and no episodes of decompensation. (Id. at 232, 239).

On April 1, 2009, Plaintiff returned to the outpatient clinic at Atmore Community Hospital and was treated with respect to bilateral knee pain, muscle spasms in her neck, headache, and weight gain. (Id. at 243). During the visit, Plaintiff denied "current pain." (Id.). The treating physician prescribed strengthening exercises for Plaintiff's knee pain, Propranolol for headaches, and Prozac for depression. (Id.). This is the final treatment note in the record. Thus, it does not appear that Plaintiff sought any additional medical treatment during the year and a half between her April 1, 2009 visit to the clinic and the administrative hearing on September 16, 2010. (Id. at 12, 320).

## 2.   Issues

### a. Whether the ALJ erred in finding that Plaintiff's impairments of adjustment disorder with anxiety and depression and migraine headaches were not severe?

In her brief, Plaintiff argues that the ALJ erred in applying the "slight abnormality" standard and finding that her adjustment disorder with anxiety and depression and her migraine headaches were non-severe impairments. (Doc. 15 at 3). The Government maintains that the ALJ's finding that these impairments are not severe is supported by substantial evidence.

In his decision, the ALJ found at step two of the sequential evaluation process that Plaintiff had the severe impairments of hyperthyroidism, hypothyroidism, status post thyroidectomy, hypertension, and osteoarthritis of the bilateral knees. (Tr. 14). The ALJ discussed the evidence relating to Plaintiff's adjustment disorder with anxiety and depression and her migraine headaches and determined that they were not severe impairments.

At the outset, the Court notes that even if Plaintiff's anxiety, depression, and migraine

headaches were severe, the ALJ's failure to classify them as severe impairments at step two of the sequential evaluation process is not fatal. See Bennett v. Astrue, 2013 U.S. Dist. LEXIS 115951, *14, 2013 WL 4433764, *5 (N.D. Ala. 2013) ("'[n]othing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe' and, even if the ALJ erred by not recognizing every severe impairment, the error was harmless since he found at least one such impairment."); Ferguson v. Astrue, 2012 U.S. Dist. LEXIS 139135, *25, 2012 WL 4738857, *9 (N.D. Ala. 2012) ("[B]ecause step two only acts as a filter to prevent non-severe impairments from disability consideration, the ALJ's finding of other severe impairments allowed him to continue to subsequent steps of the determination process and his failure to list headaches as severe does not constitute reversible error because, under the Social Security regulations, the ALJ at later steps considers the combined effect of *all* the claimant's impairments.") (emphasis in original).   Here, the ALJ found Plaintiff's hyperthyroidism, hypothyroidism, status post thyroidectomy, hypertension, and osteoarthritis of the knees to be severe at step two and then proceeded on to the next steps where he considered all of Plaintiff's impairments in combination, including her anxiety, depression, and migraine headaches. (Tr. 14-20).  Thus, the ALJ satisfied the requirements of the regulations.

Further, in order for an impairment to be severe, it must be more than a slight abnormality or a combination of slight abnormalities "that causes no more than *minimal* functional limitations." 20 C.F.R. § 416.924(c) (emphasis added).   Indeed, it must "*significantly* limit[]" an individual's "ability to do *basic work activities*." 20 C.F.R. § 416.920(c) (emphasis added).  "It is [the] Plaintiff's burden to prove the existence of a severe impairment, and she must do that by showing an impact on her ability to work." Marra v. Colvin, 2013 U.S. Dist. LEXIS 105669, *13-14, 2013 WL 3901655, *5 (M.D. Fla. 2013)

(citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)); see also Barnhart v. Thomas, 540 U.S. 20, 24 (2003) ("At step two, the SSA will find nondisability unless the claimant shows that he has a 'severe impairment,' defined as 'any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities.'") (quoting §§ 404.1520(c), 416.920(c)); McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Unless the claimant can prove, as early as step two, that she is suffering from a severe impairment, she will be denied disability benefits.").

Here, Plaintiff has failed to satisfy her burden of proof with respect to the alleged severity of her headaches, anxiety, and depression. Although Plaintiff has produced medical records documenting her treatment for these conditions, none of the records indicates that any of these impairments is severe and significantly limits her ability to do basic work activities.

To the contrary, Plaintiff's records show that her headaches were frequently accompanied by acute illnesses such as sinusitis, bronchitis, upper respiratory infections, fever, body aches, and hypertension, which were treated successfully with medications and resolved. (Id. at 141-58, 160-62, 252, 257, 261-62). The record also shows that when Plaintiff reported to her treating physicians that her over-the-counter pain medications were not relieving her headache pain, they prescribed pain medications, which appear to have provided relief of her symptoms.[15] (Id.). Furthermore, Plaintiff's records reveal repeated instances of medication non-compliance.[16] (Id. at

---

[15] For example, on November 16, 2006, Plaintiff reported that "Midrin helps for a bad headache." (Tr. 141). On October 23, 2008, Plaintiff presented to the emergency room and reported that her headache was an eight out of ten on the pain scale. (Id. at 197, 199, 201). The treating physician gave her Demerol and Phenergan and reduced her headache pain to a five out of ten. (Id. at 199-200).

[16] For example, on July 11, 2008, Plaintiff was discharged from the hospital with diagnoses that included "medication non-adherence." (Tr. 190). In October 2008, when Plaintiff presented to the emergency room with complaints of chest pain and headaches that she described as an eight

160-61, 190, 199, 209).  In addition, the results of CT scans taken of Plaintiff's brain in 2000 and 2008 were unremarkable, except that the 2000 scan showed sinusitis. (Id. at 160-61, 209, 282). Moreover, Dr. Nelson, a consultative examining physician, found Plaintiff's physical examination to be largely normal, except for swelling and limited range of motion in her knees (id. at 209-11), as did consultative psychological consultant Dr. Bennett, who opined that Plaintiff's physical problems were "extremely common." (Id. at 224).   None of Plaintiff's treating or consultative examining physicians nor the State Agency consultants found any functional limitations attributable to Plaintiff's headaches.[17]

Similarly, with respect to Plaintiff's anxiety and depression, her treatment records show that she sought only sporadic treatment for these conditions, going years between treatments.  In 2000, 2003, and 2008, Plaintiff complained of anxiety and depression and received various prescriptions including Xanax, Ativan, Lexapro, and Effexor. (Id. at 158, 162-65, 245, 248, 260). On at least one occasion, in April 2008, Plaintiff reported that the Effexor was working well. (Id. at 255).   In 2009, consultative psychological examiner Dr. Bennett diagnosed Plaintiff with adjustment disorder with anxiety and depressed mood, but noted upon examination that her mood was only "mildly" dysphoric. (Id. at 222-23).  Dr. Bennett opined that Plaintiff is a woman

_____

of out ten on the pain scale, she reported that she was out of her pain medication. (Id. at 199). On February 21, 2009, Dr. Nelson noted that Plaintiff was on no current medications and had been out of medications for two months. (Id. at 209).  In March 2009, Plaintiff presented to the outpatient clinic at Atmore Community Hospital complaining of knee pain, muscle spasms in her neck, and headaches and reported that she had not had any medications in over a month. (Id. at 244).

[17] Indeed, Plaintiff's treating physician, Dr. Annabel Espinas, noted: "[Plaintiff's] complaint [related to headache pain] seems to be out of proportion [with] the general physical exam findings." (Tr. 160).  In addition, consultative psychological consultant, Dr. Bennett, noted that Plaintiff "take[s] little care of herself physically." (Id. at 224).  Dr. Bennett opined that "it is highly likely that adequate self care would improve both her physical and her emotional functioning." (Id.).

who reports problems with depression but takes no antidepressant medications and seeks no mental health intervention. (Id. at 221, 223-24). As discussed above, he concluded that "it is highly likely that adequate self care would improve both her physical and her emotional functioning." (Id. at 223). Dr. Bennett also documented Plaintiff's participation in a wide range of significant activities of daily living.[18] (Id. at 223). Overall, Dr. Bennett concluded that Plaintiff's abilities to relate to others, to function independently, to understand and carry out instructions, and to respond appropriately to supervisors and coworkers were "average."[19] (Id. at 224). Additionally, the ALJ noted that Plaintiff' continued to perform work activity after her alleged onset of disability, and that while her earnings of $11,193.61 in 2008 and $12,713.00 in 2009 did not constitute significant gainful activity, they were certainly persuasive evidence that Plaintiff's alleged symptoms resulting from her impairments are not totally disabling. (Id. at 19).

In light of this evidence, the ALJ did not err in determining that Plaintiff's headaches, anxiety and her depression did not significantly limit her ability to do basic work activities, and thus, they are not severe impairments. Thus, Plaintiff's claim that the ALJ erred in not finding these impairments to be severe is without merit.

### b. Whether substantial evidence supports the ALJ's RFC assessment?

---

[18] Plaintiff's activities of daily living are detailed in the medical evidence portion of this opinion and in the discussion of Plaintiff's RFC and, thus, will not be repeated here.

[19] The ALJ properly rejected the opinion of State Agency psychologist Dr. Eno that Plaintiff is "moderately" limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting, as well as "moderately" limited in her ability to maintain concentration, persistence, or pace. (Tr. 15). As the ALJ found, Dr. Eno's opinion is not supported by Plaintiff's treatment records or by the opinion of consultative psychological consultant Dr. Bennett. Indeed, while some of the treatment notes reference depression and anxiety, and indicate that from time to time, Plaintiff was prescribed medication to treat such, none of the treatment records suggest that Plaintiff experienced difficulties with concentration or memory, or that she was limited in following instructions. (Id. at 227, 232, 239).

Plaintiff also argues that the ALJ's finding that she retained the RFC to perform the full range of sedentary work is not supported by substantial evidence because there is no mental functional assessment from an examining or treating physician. (Doc. 15 at 3, 7-9). Specifically, Plaintiff contends that the ALJ's reliance on Dr. Nelson's consultative physical examination was flawed because Dr. Nelson did not include an RFC assessment regarding Plaintiff's functional limitations. (Id. at 7-9). The Commissioner counters that the ALJ's decision is supported by substantial medical evidence; thus, there is no error notwithstanding the absence of an RFC assessment from a treating or examining physician. Plaintiff's claim is without merit.

First, the Court rejects Plaintiff's contention that the ALJ's RFC assessment was not based on substantial evidence simply because the record is devoid of an RFC assessment by a treating or examining physician. "[T]he Eleventh Circuit has not set out a rule indicating that an RFC must be based on the assessment of a treating or examining physician in every case." Saunders v. Astrue, 2012 U.S. Dist. LEXIS 39571, *10, 2012 WL 997222, *4 (M.D. Ala. March 23, 2012). "The ALJ's RFC assessment may be supported by substantial evidence, even in the absence of an opinion from an examining medical source about Plaintiff's functional capacity." Id. at n.5 (citing Green v. Soc. Sec. Admin., 223 Fed. App'x 915, 923 (11th Cir. 2007) (unpublished)).

In Green, the Eleventh Circuit affirmed the district court's finding that the ALJ's RFC assessment was supported by substantial evidence where the ALJ properly rejected the treating physician's opinion and formulated the plaintiff's RFC based on treatment records, without a physical capacities evaluation by any physician. Id., 223 Fed. App'x at 922-24. The court held, "[a]lthough a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence

presented and the ultimate determination of disability is reserved for the ALJ." Id., 223 Fed.

App'x at 923 (citing 20 CFR §§ 404.1513, 404.1527, 404.1545); see also Packer v. Astrue, 2013

U.S. Dist. LEXIS 20580, *7, 2013 WL 593497, *2 (S.D. Ala. February 14, 2013) (the fact that

no treating or examining medical source submitted a physical capacities evaluation "does not, in

and of itself, mean that there is no medical evidence, much less no 'substantial evidence,' to

support the ALJ's decision."). Thus, Plaintiff's contention that the absence of an RFC evaluation

by a treating or examining physician means that the ALJ's RFC assessment is not based on

substantial evidence is simply incorrect.

Second, as in Green, the Court finds that substantial evidence supports the ALJ's RFC

assessment that Plaintiff can perform the full range of sedentary work.[20] (Tr. 20). Residual

functional capacity is a measure of what Plaintiff can do despite his or her credible limitations.

See 20 C.F.R. § 404.1545. Determinations of a claimant's residual functional capacity are

reserved for the ALJ, and the assessment is to be based upon all the relevant evidence of a

claimant's remaining ability to work despite his impairments. See Beech v. Apfel, 100 F. Supp.

2d 1323, 1331 (S.D. Ala. 2000) (citing 20 C.F.R. § 404.1546 and Lewis v. Callahan, 125 F.3d

1436, 1440 (11th Cir. 1997)). Once that decision is made, the claimant bears the burden of

demonstrating that the ALJ's decision is not supported by substantial evidence. See Flynn v.

Heckler, 768 F.2d 1273, 1274 (11th Cir. 1985). Plaintiff has failed to meet that burden.

---

[20] "Sedentary work is defined as 'lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.'" Siverio v. Commissioner of Soc. Sec., 461 Fed. App'x 869, 871 (11th Cir. 2012) (unpublished) (quoting 20 C.F.R. § 404.1567(a)). "Social Security Ruling ('SSR') 83-10 further elaborates on sedentary work by providing that 'periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.'" Id. (quoting SSR 83-10, available at 1983 WL 31251).

While the medical evidence in this case shows that Plaintiff has a history of hyperthyroidism, hypothyroidism, status post thyroidectomy, hypertension, and osteoarthritis of the knees, it also shows that none of these conditions is disabling, whether considered alone or in combination with all of Plaintiff's severe and non-severe impairments.   With respect to Plaintiff's hyperthyroidism, hypothyroidism, and thyroidectomy, the medical records reflect that while she received treatment for these impairments, the prescribed medication was effective when taken, and none of Plaintiff's treating physicians noted any functional limitations resulting from her impairments.   Additionally, the ALJ's RFC assessment that Plaintiff can perform the full range of sedentary work is supported by the report of consultative examining physician Dr. Nelson.  On February 21, 2009, Dr. Nelson noted that his physical examination of Plaintiff was largely normal with respect to her head, ears, eyes, nose, throat, neck, lungs, heart, and abdomen. (Tr. 210).  Likewise, Plaintiff's neurological examination was normal. (Id.).  Dr. Nelson did note that Plaintiff had peri-articular swelling of both knees with mild popping of the joints, pain on movement, limited range of motion in both knees, and a "slow careful gait." (Id. at 210-11).   In addition, Plaintiff could not stand on her tiptoes or heels, tandem walk, or bend and squat without pain. (Id. at 210).  Otherwise, Dr. Nelson noted that Plaintiff had no edema, no cyanosis, or erythema; she was in no acute distress; she ambulated without assistance; and she was able to rise from a sitting position without assistance. (Id.).  Also, Plaintiff's grip strength was "5/5," with adequate fine motor movements, dexterity, and ability to grasp objects bilaterally. (Id.).  Dr. Nelson noted that Plaintiff was "independent with her activities of daily living," that she can drive, and that she can lift light objects. (Id. at 209).  Dr. Nelson opined, "[f]rom a medical viewpoint, she needs to start back on her medications[;][21] this and weight loss should help with

---

[21] Plaintiff reported that she had taken no medications for two months. (Tr. 209).

her osteoarthritis in the knees." (Id. at 211).  He concluded, "[Plaintiff] most likely will have difficulty walking and/or standing for a full workday, or lifting/carrying objects without limitations. . . [, but] [s]he should be able to sit for a full workday, hold a conversation, respond appropriately to questions, and carry out and remember instructions." (Id.).

The ALJ's RFC determination is further supported by the Physical RFC Assessment of State Agency physician Dr. Crump, who after reviewing Plaintiff's medical records, including Dr. Nelson's consultative examination, opined that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk for at least two hours (but no more than four hours) in an eight hour workday, sit for at least six hours in an eight hour workday, and occasionally push and/or pull. (Id. at 214-15).  Dr. Crump also found that Plaintiff could never climb ladders or ropes but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Id. at 215).  He found no manipulative, visual, communicative, or environmental limitations, except that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. (Id. at 216-17).

In addition, the ALJ's RFC determination is supported by the report of consultative psychological consultant Dr. Bennett who examined Plaintiff on March 10, 2009, and observed that Plaintiff functions in the low average range intellectually, that her thought processes are normal, and that her concentration and attention are not significantly impaired. (Id. at 222-23). Dr. Bennett also found Plaintiff's memory, fund of information, abstract reasoning skills, and judgment and insight to be average. (Id.).   Dr. Bennett diagnosed Plaintiff with Adjustment Disorder with Anxiety and Depressed Mood, and opined that Plaintiff's abilities to relate to others, to function independently, to understand and carry out instructions, and to respond appropriately to supervisors and coworkers is average. (Id. at 224).  He concluded that Plaintiff

"could probably make significant improvement in virtually every area of life with appropriate mental health intervention and with some health maintenance behaviors." (Id. at 223-24).

Finally, Plaintiff's reported activities of daily living support the ALJ's RFC assessment. Plaintiff reported daily activities include preparing meals, doing light household chores, including laundry, shopping for groceries, driving, helping to rear her children, watching television, visiting with friends often, and going to church. (Id. at 223).  Additionally, the fact that Plaintiff continued work activity after her alleged onset date and earned $12,713 in 2009 is also persuasive evidence supportive of the ALJ's RFC assessment.

Based upon a careful review of the record in this case and for the reasons set forth above, the Court finds that the ALJ's RFC assessment that Plaintiff can perform the full range of sedentary work is supported by substantial evidence.  Therefore, Plaintiff's claim is without merit.

### V.        Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **26th** day of **September, 2013.**

_____
/s/  **SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**
